Tormu E. Prall
#531669
Mercer County Correction Center
P.O. Box 8068
Trenton, NJ 08650

---

| | |
|---|---|
| TORMU E. PRALL, | UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS |
| pro se Plaintiff, | |
| -VS- | C.A. NO: 09-10110-MLW |
| CITY OF BOSTON; JOHN DOES 1-99, a/k/a, UNKNOWN NAMED BOSTON POLICE OFFICERS; JOHN MOE, a/k/a, MAGISTRATE JUDGE; JANE DOE, a/k/a, COMMONWEALTH JUDGE; | 10 CA 10058 PBS CIVIL ACTION MAGISTRATE JUDGE Collings |
| Defendants. | |

## COMPLAINT

### I. JURISDICTION

1. This Court has 42 U.S.C. § 1983 Jurisdiction and Jurisdiction under Sections 1959, 1961(1)(A)(B), and 1962 of Title 18 of the United States Code.

### II. VENUE

2. Venue is proper because issues relevant to this case took place in the District of Massachusetts.

### III. PARTIES

3. Tormu E. Prall is the plaintiff.

4. Defendant City of Boston (the "City") is sued herein for

-1

its customs or policies under § 1983.

   5. Defendants John Does 1-99 are Unknown Named Police Office-
rs in the Boston Police Department (BPD).

   6. Defendant John Moe is a Unknown Named Magistrate Judge
(Magistrate) in the BPD.

   7. Defendant Jane Doe is an Unknown Named Commonwealth Judge
(Commonwealth Judge) in a Courthouse in Middlesex County.

   8. The Defendants in Paragraphs 5 through 7 are sued in wh-
ichever capacities that don't immune them from being sued for
their Racketeering (assault, kidnapping, bribery, extortion,
wire fraud, and commerce) Activities.

IV. THE FACTS

   9. In the early morning hours on Saturday, May 17, 2008,
plaintiff and two of his friends were stopped by a group of pol-
ice officers while walking in the City of Boston.

a.
   -The officers concocted the story that they had received a
dispatched that the plaintiff, a black male, and his black male
acquaintance, were holding their white female companion against
her will.

b.
   -The sole purpose of the stop was to conduct checks for warr-
ants. When the name Denzil Wilington that plaintiff gave the pol-
ice was not in the system; the officers ordered for both of plai-
ntiff's friends to leave; and then they (the officers) falsely
locked plaintiff up on a charge of drinking in the public. The
arrest was a ruse to see if a fingerprint check would identify
plaintiff as the person who he had claimed to be.

-2-

c.

-With one arm cuffed to a railing at police headquarters, one of the supervisory arresting officers attempted to force the plaintiff to be fingerprinted. When plaintiff refused, this supervisory arresting officer savagely almost choked the life out of the plaintiff. The other officers that the supervisor choked plaintiff in front of, stood by and watched.

d.

-Plaintiff was then placed in a cell. Shortly thereafter, one of the arresting officers ordered plaintiff to the crack of the door tp talk about his release. When plaintiff came forward to do so, the officer maced plaintiff through the door.

e.

-The Magistrate's and all the police's, plaintiff came in contact with, only concern was for plaintiff to be printed; not plaintiff's constant complaints (the entire time he was in custody) that he had been falsely arrested.

f.

-The Magistrate, as well as all supervisory officers responsible for reviewing arrests, viewed the evidence (there was none) and knew probable cause for the arrest was lacking.

g.

-But the Magistrate was so eager to allow the dirty business of the police to succeed, that he (the Magistrate) personally approached the cell in which plaintiff was housed, in an effort to convince the plaintiff to be booked and printed. When plaintiff rejected this offer, the Magistrate informed that he (the Magistrate) sat next to the Commonwealth Judge that plaintiff would have to go in front of for the charge. The Magistrate said that he (the Magistrate) would see to it that the Commonwealth Judge not release the plaintiff, unless and until plaintiff was booked

-3-

and printed.

h.
-Badly depressed from the totality of the mistreatment, plai-
ntiff suffered a subjective heart attack that was so severe and
painful, that he had to be taken by ambulance to Boston Medical
Center (BMC). After plaintiff was discharged from BMC, the male
and female officers who transported plaintiff back to BPD, attem-
ted also to convince the plaintiff, to be booked and printed.

i.
-In Court on Monday following the arrest, the Magistrate was
indeed sitting next to the Commonwealth Judge plaintiff had to go
in front of to deal with the charge.

j.
-The prosecutor moved for the charge to be dismissed as there
was no evidence. At this moment, plaintiff could see the Magistr-
ate rubbing up against the Commonwealth Judge as to indicate and
remind the Commonwealth Judge that plaintiff was the person, that
he (the Magistrate) had talked to her (the Commonwealth Judge)
about.

k.
-The Commonwealth Judge then ordered plaintiff taken back to
BPD to be booked and printed (just as the police wanted) before
she (the Commonwealth Judge) would let the plaintiff go. The Com-
monwealth Judge's on the record reason for conditioning plainti-
ff's release on being booked and printed, was "we do not even
know who this man is."

l.
-Once plaintiff was booked and printed and taken back to
Court, the charge was dismissed, and plaintiff was released.

m.
-The cameras in the BPD purportedly stored and monitored sub-

paragraphs(a)-(l) from when the plaintiff arrived, up until the time, that the plaintiff left.

### V. POST-EVENT BEHAVIOR

10. After plaintiff was released, the BPD sponsored and endorsed publicity that created the false public impression that plaintiff was actually drinking or drunk in the public, when he was arrested. The information that the BPD influenced the Media to put out about the plaintiff, censored and suppressed the customs which had been in existence in the City of Boston, before the date of the incident:

a.
-The scenario in this case was no different than any of the previous police encounters made over the years. The arrest practice that was employed by the Boston Police Officers (BPO) was the way things were done and had been done in the City.

b.
-The officers in this case were following what had been accepted departmental practice in the past. The event itself involved the joint actions of all three shifts of the BPD.

c.
-All officers involved in this case were operating under a shared set of rules and customs. Absent such a norm, it is highly unlikely that such unanimity of action could occur.

d.
-If a constitutional practice of arrest had been the accepted norm in the BPD, then the conduct of the officers in this case would have fell within one of the well-delineated exceptions to the warrant requirement.

e.
-Under existing practice, the officers knew they could treat the plaintiff the way they did without violating BPD policy.

-5-

f.
-The failure of all three shifts in the BPD to act at even
minimal accepted levels of police conduct in this case, was di-
rectly linked to the policy of deficient recruitment, training,
supervision and discipline of the Boston Police Force.

g.
-Due to the inadequacy of supervisory training, all supervi-
sors in this case either created the circumstances that criminal-
ized the Fourth and Fifth Amendments rights plaintiff sought to
exercise; or, abdicated their responsibilities to the plaintiff,
and left plaintiff in a situation that demanded control by supe-
rvisory officers.

h.
-The absence of a strictly enforced disciplinary system lead
the BPO in this case to believe they were above the law and would
not be sanctioned for their misconduct.

i.
-A sufficiently supervised, properly recruited, trained and
disciplined group of BPO would not have acted so far below the
level of accepted police behavior in this case.

j.
-BPO received the same training and supervision and had the
similar understanding about whether they would be subject to
discipline for their actions. The City just didn't hire one bad
apple, but produced an entire barrel of bad apples that came in
the bunch.

k.
-State and Municipal Judges working out of BPD and the app-
licable Court House in Middlesex County could be easily infilr-
ated, taken over, corrupted, and bribed by BPO into ineffective-
ness. The unconstitutional actions of BPO became the actions of

-6-

these Judges.

## VI. UNCONSTITUTIONAL MUNICIPAL CUSTOM

11. Between 2006 to 2008, BPO had a longstanding, widespread, and facially unconstitutional practice of:

a.
-Using stereotypes to treat blacks and hispanics differently than other racial groups.

b.
-Abusing their duties by failing to focus on blacks' and his-panics' constitutional rights to be secured from unreasonable se-arches and seizures; to be protected from selective enforcement and prosecution; and to be freed from the cruel trilemma of self-incrimination.

c.
-Arresting, charging and fingerprinting blacks and hispanics at much higher rates or at disproportionate rates as compared wi-th other racial groups.

d.
-Responding with false arrest, illegal detention, use of for-ce, and other types of lawless law enforcement, to search for ev-idence of criminal activities through fingerprints, whenever cit-izens' unknown to BPO, names were not in the system.

e.
-Using deadly, physical, mechanical, or chemical force on bl-acks and hispanics at much higher rates or at disproportionate rates as compared with other racial groups.

f.
-Having generalized hunches (i.e., civilians unable to prod-uce satisfactory identification), not particularized facts, to believe citizens were wanted or had engaged in illegal or irregu-lar conduct in the past.

g.
-Forcing citizens to surrender their Fourth Amendment pro-
tections on the say so of BPO. Unlawfully restraining the freed-
om of movement of citizens, who refused to speak with BPO, and
lawfully attempted to walk away.

h.
-Retaliating with third-degree tactics to conduct fingerprint
checks, whenever a wanted person, who was not known to BPO, invo-
ked the privilege against self-incrimination, and gave BPO a name
that was not in the system.

i.
-Either turning the cameras installed in Boston Police Vehi-
cles (BPV) in the opposite direction or tampering with video cam-
eras installed in BPD to hide conclusive evidence of the conduct
of BPO during stops; checks for warrants; the booking and printi-
ng process; and of when civilians arrived at, and until they left
from, BPD.

j.
-Operating under a culture (blue wall of silence) in which
almost, if not every, last BPO either turned the blind eye or de-
af ear when a citizen was framed, coerced, beaten, killed, intim-
idated or mistreated by fellow officers.

k.
-Turning the blind eye or deaf ear being the in-service trai-
ning existing officers and supervisors provided to new recruits.
Existing officers and supervisors pressuring newcomers into rat-
ifying the blue wall of silence culture as necessary means of
operating the Boston Police Force.

l.
-Existing officers and supervisors exerting coercive power
and providing significant encouragement to, new recruits and each
other to condone the sinister sophism that the end, justified the

employment of illegal means.

m.

-Operating a police force in which higher power only afforded for a greater degree of lawlessness. The investigators and supervisors in the chain-of-command ladder either acquiesced in, willfully accepted, or did nothing to prevent, the use of improper methods or third degree tactics (i.e., substitute for skillful and scientific investigation), before they moved up the ranks.

n.

-In addition to being friends, lovers, family members, and off-and-on duty associates, the tenets of loyalty was expected by reason of being a BPO. Any Aversion shown to those tenets invited trouble and undermined the position BPO held on the force.

o.

-Sponsoring publicity, on the one hand that effectively placed the state of affairs in a much more credible and favorable position for BPO. And, then on the other hand, endorsing publicity that discredited victims of unlawful BPO conduct by virtue of their status as minorities, under-privileged, and/or defendants.

p.

-Concealing the existence of the pattern or practice of BPD that deprived persons of the rights, privileges or immunities secured or protected by the Constitution or the Laws of United States and Massachusetts from the judiciary in civil rights litigation and suppression of evidence challenges; and from the public in feedback concerning that information.

## VII. SUPERVISORY INACTION

12. Long before Paragraph 9 had happened, the Mayor of Boston (Mayor) and the Boston Chief of Police (Chief) were put on notice about Paragraphs 10 to 11 through an extensive report review

process that they utilized to monitor the conduct of officers
and to ensure officers' compliance with the rules of the depar-
tment. Both men were alert to the practices that transgressed
BPD policy and had the means to correct the constitutional in-
firmities and to provide the cure. After discussing the issues,
the Mayor and the Chief decided to knowingly and recklessly dis-
regard the inadequacy of the approach they took, and the availa-
bilty of other approaches, including those steps proposed by the
plaintiff. The failure of the Mayor and Chief to employ any stan-
dard procedures to at least minimally comport with the solutions
suggested in subparagraphs (a)-(h), was not only the cause of and
moving force behind the injuries, but made the constitutional vi-
olations bound to happen, sooner or later, to some future party.

a.
-In-service training on Fourth and Fifth Amendment and cultu-
ral diversity issues. The issuance of revised Standard Operating
Procedures (SOPs) and the development of practical stop criteria
to be used by BPO in exercising their discretion in selecting w-
hich individuals to stop.

b.
-Establishment of procedures requiring BPO to inform the dis-
patcher of his or her intent to conduct an warrant exception stop
before conducting the stop. Requiring BPO to report the racial
characteristics of all individuals involved in the stop, and the
reason for the stop, to the dispatcher; and to keep track of this
information in their log book or in other official documents.

c.
-Development of early warning system to detect the disparate
impact that exposed the citizens of the City of Boston to immine-
nt police misconduct. Implementation of a Management Awareness

-10-

Program designed to identify and modify potentially problematic
behavior of BPO and to promote best practices among BPO.

d.
-Development of criteria to prevent BPO from falsely using
observation of citizens' physiological symptoms and responses as
a pretext to conduct fingerprint check. Requiring that stops be
recorded by video cameras installed in BPV to provide conclusive
evidence of officers' conduct during stops.

e.
-Establishment of criteria for making District or City Attor-
neys available twenty-four hours a day to answer officers' quest-
ions concerning search and seizure, custodial interrogation,
self-incrimination, and related issues.

f.
-Up-to-date direction in supervisory or command training that
the blue wall of silence or pressuring newcomers into ratifying
that culture was not an acceptable viewpoint necessary to effect-
ively supervise and operate the Boston Police Force.

g.
-Adequate supervision at all [BPD] levels of operation and
administration of measures which would minimize the chance of
error and maximize the full satisfaction of constitutional prot-
ection.

h.
-Independent monitor specifically appointed to oversee if
Internal Affairs Investigators were properly investigating and
resolving misconduct complaints; and to regularly provide reports
to the Mayor and the Chief to ensure BPO were performing their
duties in accordance with these requirements or policies to pro-
tect citizens from lawless police behavior were carried out.

COUNT I.

-11-

For the purpose of gaining entrance to or maintaing or increasing position in the Enterprises (BPD and Middlesex County Courthouse) through which the illegal conduct occurred, the Magistrate and Commonwealth Judge, and BPO did, and conspired with and aided and abetted each other to:

1. Kidnap the plaintiff. See M.G.L.A. 265 § 26; and sections 2, 241, 1959(a)(1,5), 1959(b)(1,2), and 1961(1)(A) of Title 18 of the United States Code [Title 18].

### COUNT II.

For the purpose of gaining entrance to or maintaining or increasing position in the Enterprise through which the illegal conduct occurred, BPO did, and conspired with and aided and abetted each other to:

1. Assault the plaintiff; assault plaintiff with a deadly weapon; and attempt to cause plaintiff serious bodily injury. See M.G.L.A. 265 § 15A(b); M.G.L.A. 265 § 29; ans sections 2, 241, 1959(a)(3,6) and 1959(b)(1,2) of Title 18.

### COUNT III.

The crime of bribery was committed when in order to gain entrance, maintain, or increase position and profit unlawfully:

1. The Magistrate and Commonwealth Judge altered their official acts to obtain something of value (plaintiff's fingerprints) for BPO. See M.G.L.A. 268 § 3; and sections 2, 241, and 1961(1)(A) of Title 18.

### COUNT IV.

The crime of extortion was committed when the Magistrate and Commonwealth Judge and BPO did, and conspired with and aided and abetted each other to:

-12-

1. Condition plaintiff's release on being booked and print-
ed because he (the victim of an illegal search and seizure) re-
fused to participate in the exploitation of conduct in violation
of the explicit command of the Fourth and Fifth Amendment.

2. Obtain something of value (fingerprints) from plaintiff by
illegal means.

3. Unlawfully force the plaintiff to surrender his Fourth and
Fifth Amendment rights, just because they could do so. See
M.G.L.A. 265 § 25; and sections 2, 241, and 1961(1)(A) of Title
18.

### COUNT V.

Interstate and foreign commerce were affected because:

1. The Enterprise (BPD and Middlesex County Court) through
which the illegal conduct occurred, sent and received mail, fax-
es, telephone calls, and electronic communications to and from
lawyers, litigants, public officials and residents in foreign c-
ountries and other states.

2. Lawyers, litigants, public officials, and people travelled
from BPD and Middlesex County Court (MCC) to foreign countries
and other states, and vice versa. See sections 2, 241, and
1962(d) of Title 18.

### COUNT VI.

The Magistrate and Commonwealth Judges' and BPO' extortion
and bribery affected commerce because in order to further the
scheme perpetrated on the plaintiff:

1. BPO electronically transmitted plaintiff's fingerprints
to the FBI to be analyzed against fingerprints on file in the FBI
national fingerprint database.

2. BPO electronically transmitted plaintiff's fingerprints to their vender in Canada to analyze his prints. See Sections 2, 241, 1951, 1952, and 1961(1)(B) of Title 18.

### COUNT VII.

Wire fraud was committed when:

1. The Magistrate and Commonwealth Judge and BPO failed to disclose to the FBI and their vender in Canada that they were using the facilities in commerce in furtherance of the scheme to deviate from the performance of honest and impartial services they owed to the plaintiff and to the public. See Sections 2, 241, 1341, and 1961(1)(B) of Title 18.

### COUNT VIII.

Plaintiff's injuries occurred as a direct and immediate consequence of the unconstitutional custom of BPO and the deprivations of plaintiff's rights were affirmatively linked to the Mayor and Chief having a policy of inadequate recruitment, training, supervision and discipline of the City of Boston Police Officers.

### IX.

The Fifth Amendment was violated when:

1. BPO responded with false arrest because plaintiff invoked the privilege against self-incrimination & gave BPO a name that was not in the system.

### PRAYER FOR RELIEF

The following Relief is Prayed for:

1. That this Court, under 18 U.S.C. § 1964(a), to Declare that the Defendants violated the RICO Act;

2. Declaratory Judgment that BPO and the City of Boston violated the plaintiff's 42 U.S.C. § 1983 Civil Rights;

-14-

3. Defendants borne the cost plaintiff has to pay for bring-
ing this suit;

4. Compensatory, Punitive and Treble Damages, as well as
Damages allowed under 42 U.S.C. § 1983; and

5. Any other Award or Equitable Relief allowed by Statute,
or pursuant to the Equitable and Just Power of the Court.




Dated: 12/01/09                     Tormu E. Prall, pro-se